RECEIVED AND FILED
2005 FEB 10 PM 2 26
U.S. DISTRICT COURT
SAN JUAN, P.R.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

```
-------------------------------------
UNITED STATES OF AMERICA

          vs.                    : CR. NO.

JESUS ROJAS TAPIA               : 03-019(PG)

-------------------------------------
```

FURTHER JURY TRIAL

The above-entitled cause came on to be heard before
the HONORABLE JUAN M. PEREZ-GIMENEZ, U.S. District
Judge,  sitting in Hato Rey, Puerto Rico on January 15,
2004.

BOABDIL VAZQUETELLES, JR., CM,
Official Court Reporter
P.O. BOX 11850, SUITE 236
SAN JUAN, PUERTO RICO 00922-1850
(787) 250-8507 - 525-3487

bovaz@mail.com



APPEARANCES:

ATTORNEY FOR THE GOVERNMENT:

IRENE FELDMAN, AUSA

ATTORNEY FOR DEFENDANT:

RAUL MARIANI FRANCO, ESQ.

WITNESSES:
JIM CASTRO CRUZ

1          (The case was called)

2          (The jury is present)

3          THE COURT: Good morning, lady and gentlemen

4  of the jury.  I am glad to see all of you here today.

5  Today we are only going to work until noon time.  I

6  have other matters I couldn't finish and I need to

7  work at them this afternoon, so we will work today

8  just until noon time and tomorrow we will work all

9  day.

10         When we recessed on Tuesday I advised you

11  that today we would start with the opening statement

12  of the attorneys.  Remember that the attorneys do not

13  have to make an opening statement, and if any opening

14  statements are made, that is not evidence of the

15  case. It is merely to outline to you what the

16  evidence which they intend to present to you consists

17  of, so the opening statements are not evidence.

18         I ask the government, are you going to make

19  an opening statement?

20         MS. FELDMAN: Yes, Your Honor, the

21  government will be making an opening statement.

22         THE COURT: Okay. Go ahead.

23         MS. FELDMAN: May it please the court?

24         THE COURT: Go ahead.

25         MS. FELDMAN: Good morning, lady and

55

1    gentlemen of the jury.

2              THE COURT: Remember my 38th parallel.

3              MS. FELDMAN: Yes, Your Honor.

4              December 30, 2002, it started like a day

5    that was like any other day, but that day changed the

6    lives of many people, because unbeknownst to a pilot

7    named Juan Feliciano that day was the day the

8    defendant, Jesus Rojas Tapia, and another man Angel

9    Rivera Marcano were going to come to this place of

10   business and were going to hijack the helicopter that

11   he was flying. In addition, that was the day that

12   that pilot doing his job for Helicorp, Caribbean

13   Helicorp Incorporated was going to be forced at

14   gunpoint to go to Las Cucharas, a maximum security

15   prison, and he was going to be forced on that day to

16   assist the two men who were hijacking the helicopter

17   with the prison break of five inmates. One of those

18   inmates was the brother of the defendant, and one of

19   those inmates name was Jose Rojas Tapia, the brother

20   of Jesus Rojas Tapia.

21             Now, unbeknown to the pilot, Juan

22   Feliciano, on December 27th or 28, 2001, excuse me,

23   2002, a woman called his business, Caribbean Helicorp

24   Incorporated, and that woman made a reservation for a

25   pilot and for a helicopter to fly to the Ponce area,

1        to El Tuque to do some engineering work, some

2        surveing work and that was

3        typical as you will hear from the testimony of the

4        work that the pilot and the helicopter company did

5        and you hear the witnesses testify that after that

6        reservation had been made on December 27th or 28th,

7        two men did in fact show up on the morning of

8        December 30, 2002, and one of those men, again, was

9        the defendant, Jesus Rojas Tapia and you will hear

10       from the witnesses, from their testimony that the two

11       men arrived between eight and eight fifteen, before

12       the pilot, and you will hear the testimony of the

13       pilot, how he arrived about eight thirty and as a

14       normal daily start, he greeted the customers, and he

15       showed them where the helicopter was, and then he

16       asked them to enter the helicopter, and he started on

17       the helicopter trip that would change his life, and

18       possibly at eight forty five A.M. on December 30,

19       2002, a blue helicopter owned by Caribbean Helicorp

20       was being -- a flight that was leaving the Isla

21       Grande Airport with the pilot and the defendant and

22       another man in the aircraft, and that aircraft was

23       registered with the Federal Aviation Administration,

24       and that aircraft was registered as an aircraft

25       within the jurisdiction of the United States.

1          Now, shortly into the flight, as the pilot

2     neared Ponce, the men who were travelling as his

3     passengers took out guns and pointed them at the

4     pilot, and they shouted at him, and they told him in

5     no uncertain terms that he was to take them to Las

6     Cucharas maximum security penitentiary and then the

7     pilot knew what was happening and they were shouting

8     at him, and they were ordering him, and he will

9     testify, lady and gentlemen, that he was in fear for

10    his life, and he will tell you about how he got to

11    the prison, and how he was directed by the passenger,

12    by the hijackers, by the defendant, Jesus Rojas

13    Tapia, to hover over the roof of the basketball

14    court, or one of the basketball courts at the prison

15    and on top of the roof there were inmates, one was

16    waving a burgundy towel and those inmates were the

17    ones that he was ordered to pick up.

18         Now, as you might imagine, and as the

19    witness will tell you, it wasn't an easy task, with

20    people pointing guns at him, he managed to maneuver

21    that helicopter over the prison, and he was able to

22    get in a position so that the inmates could jump on

23    board.        Now, it wasn't easy for the inmates to

24    do that either, but they were escaping from prison so

25    they had a motive to work harder and jump into that

58

1    helicopter. One of the inmates didn't make it into

2    the helicopter, but he was hanging on to the edge of

3    the helicopter.

4         That pilot was ordered to leave the prison

5    immediately after the four men were on board and the

6    one was hanging on, and the pilot will tell you how

7    he flew to an area, and he, at the order of the

8    hijacker, maneuvered the helicopter in such a way

9    that they could jump off, and that was the last time,

10   on December 30, 2002 that Juan Feliciano saw the men

11   who had hijacked in the helicopter ride.

12        Now, needless to say, the pilot will tell

13   you that he was very shaky, very nervous, very upset,

14   and he called Caribbean Helicorp and he told them

15   what had happened, but not only did he report the

16   incident, he was concerned about getting back safely

17   because one of the doors of the helicopter was

18   hanging off, so he took that helicopter to a nearby

19   mountain top and he landed it to try and fix the

20   door, and again he phoned the office to tell them

21   what had happened. He wasn't able to fix the door,

22   so, he will tell you that he pulled it off and put it

23   in the helicopter, because it was a risk to the

24   safety of flying that helicopter, and then he

25   returned to Caribbean Helicorp, obviously very upset.

1    Shortly thereafter, you will hear

2    testimony of agents, local police of the Department

3    here in Puerto Rico, and also agents of the Federal

4    Bureau of Investigation who were sent out on a

5    massive manhunt and, you will also hear testimony

6    that on January 2, 2003 agents of Operaciones

7    Tacticas in Ponce, Puerto Rico Police Department

8    Agents captured three of the defendants, three of

9    them were involved in the hijacking, including Jesus

10    Rojas Tapia whose nickname by the way, is Buho.

11    Now, Buho was caught on January 2, 2003 and

12    at the same time he was caught, his brother, Jesus

13    Rojas Tapia, also known as Gordy, excuse me, Jose

14    Rojas Tapia, also known as Gordy was caught and

15    another man, Orlando Valdez Cartagena.  All three

16    were caught on January 2, 2003, and all three were

17    caught with firearms, all three had weapons and all

18    three had the weapons that were used to break out of

19    that prison on December 30th, 2002.

20    Now, lady and gentlemen, at the end of the

21    case, at the end of hearing all testimony, you will

22    hear the instructions of the honorable judge, and you

23    will be able to render a verdict. After hearing all

24    the evidence, you will be able to find the defendant,

25    Jesus Rojas Tapia, also known as Buho, guilty as

1    charged. Thank you.

2            THE COURT: Thank you. Mr. Mariani.

3            MR. MARIANI: Yes.  I am going to make an

4    opening.  If I may do it from here, Your Honor?

5            THE COURT: Go ahead.

6            MR. MARIANI: Good morning, ladies and

7    gentlemen of the jury. My name is Raul Mariani, I am

8    an attorney for Jesus Rojas Tapia, and I will be

9    defending him throughout this case.

10            Mr. Rojas Tapia has plead not guilty. He

11   maintains his innocence. The government says he is

12   guilty, the government has explained in her opening

13   statement it is for you to decide what is the proof

14   in this case.

15            I pray that you keep an open mind

16   throughout the case, and that you wait for all the

17   evidence to be presented, and then after that to

18   decide and to determine whether Mr. Rojas Tapia is

19   guilty or innocent.

20            You may be surprised, it doesn't happen

21   often, but I may agree in this case some of the facts

22   that the prosecutor has explained to you. This is a

23   case involving a jail break, a "fuga", and as the

24   prosecutor has explained to you, as the evidence will

25   show, a jail break did occur on December 30, 2002 at

1      Las Cucharas Correctional Facility in Ponce.

2              You will hear evidence that Las Cucharas is

3      a gigantic prison. It has different units where

4      different kinds of prisoners are held. It has a

5      women's facility, it has a minimum custody facility.

6      It t has a medium custody facility, and it has a

7      maximum security. The maximum security facility is

8      called the green monster, and you will hear evidence

9      that that facility, the green monster, is the highest

10     security facility in Puerto Rico.

11             On December 30, 2002, however, five

12     inmates, and the evidence will be presented here,

13     somehow gained access to the roof of the institution.

14     You will hear the testimony here from corrections

15     officer standing guard at a tower that he saw early

16     in the morning some people gaining access to the

17     roof. Prisoners of at Las Cucharas green monster

18     facility are dressed in blue, blue overalls, and you

19     will hear testimony as to that fact.

20             This agent in the watch tower saw these

21     individuals and in a minute or two determined that

22     they shouldn't be there. You will hear evidence that

23     this officer of the Corrections Department made a

24     radio call, but he will testify that the events

25     occurred so rapidly that once he was making the call

1    reporting the escape, an helicopter came and took

2    these people out. A perfect jail break, perfect.

3    Five inmates boarded in less than a minute or two,

4    perfectly coordinated. They weren't in the roof much

5    time, and you will hear evidence as to that,

6    perfectly coordinated. Five inmates in a couple of

7    minutes went into a helicopter and left the maximum

8    security prison post, and with that I agree with the

9    government.

10          You will hear evidence, however, and I also

11   agree with the evidence in this part with the

12   government, that there was a helicopter ride on

13   December 30, 2002, and the helicopter is owned by a

14   company, not by the pilot, but by the company,

15   corporation who has facilities in Isla Grande.  Isla

16   Grande is the second largest airport in Puerto Rico

17   and you will hear testimony that the helicopter on

18   the morning of December 30, 2003, 2002, I am sorry,

19   departed from Isla Grande. You will hear evidence of

20   the time that it takes from Isla Grande to Ponce in a

21   helicopter. It is a specific amount of time that it

22   takes to get to the Tuque area.

23          You will hear evidence that the Tuque area,

24   if you have not been there, is very close to Las

25   Cucharas. As a matter of fact, you will hear

1        testimony that it only takes approximately ten or

2        twenty seconds to get in a helicopter from El Tuque

3        to Las Cucharas prison.

4                You will hear testimony, as the government

5        has stated, and in this I don't agree, that at some

6        point in time, my client, Jesus Rojas Tapia, who is

7        the brother of Jose Rojas Tapia, Gordy, which in fact

8        he was in Las Cucharas prison. You will hear

9        testimony that the pilot alleges that Mr. Rojas Tapia

10       pointed a gun at him, at some point in time in the

11       flight. However, you will also hear evidence that

12       when the two individuals that reached Caribbean

13       Helicorp on December 30th of 2002, no one asked them

14       for any identification, no one asked them to pay for

15       the trip they were going to make to Ponce. The

16       evidence will show that the pilot boarded the two

17       individuals, who he says he didn't know, without

18       asking for any identification or asking for any

19       money. You will hear evidence and you will hear

20       testimony of the pilot, that after picking up the

21       inmates, after being pointed at with the gun, and

22       after picking up the inmates at Las Cucharas, that he

23       was hit with an opened hand several times.  You will

24       hear testimony that he received several blows from

25       the inmates from the maximum security Las Cucharas

64

1    prison.

2            You will hear evidence that on that same

3    day, December 30, 2002, government agents, FBI

4    agents, federal agents interviewed and had access to

5    this pilot.  You will not receive evidence, any

6    photographs as to the blows or to the marks, if any

7    were left because of the hits this pilot took,

8    allegedly took, in the morning of December 30, 2003.

9            You will hear testimony, the government

10   counsel has stated, that upon leaving the inmates

11   some place in Ponce, the pilot used a cell phone,

12   cellular phone, and you will hear testimony that the

13   helicopter that this pilot used on December 30, 2003

14   was a new one, recently purchase by Caribbean

15   Helicorp, and you will hear testimony that that

16   helicopter needed and had to have a two way radio. A

17   two way radio could contact the air traffic

18   controllers at Isla Grande or in the other air

19   traffic pattern that exist in Puerto Rico.

20           The pilot, the evidence will show, didn't

21   use the two way radio. He used a cell phone and, the

22   evidence will show that he used that cell phone to

23   contact his office, the office in Isla Grande. The

24   first phone call was not to the police, or to FURA or

25   to federal agentS, but to the tower, control tower,

1       it was to his office.

2              The evidence will show that his second

3       phone call was made to the director of operations of

4       Caribbean Helicorp, and that the third phone call he

5       made was to his wife. As a matter of fact, the

6       evidence will show that the pilot never contacted any

7       authority directly, calling any authority after

8       allegedly being hijacked.         The evidence will

9       show, as the prosecutor has explained, that the pilot

10      made one stop to allegedly fix a broken door that was

11      causing problems with his helicopter, however, the

12      evidence will show that he didn't use his two way

13      radio to notify air traffic control that he was

14      having problems or that he had to land, an emergency

15      landing in Jayuya to fix the broken door.

16             Moreover, the evidence will show that after

17      the pilot returned to Isla Grande, the helicopter was

18      sealed off in a hangar, so no one could touch the

19      helicopter; preserve the helicopter for the

20      government agents to go there and inspect the

21      helicopter, and you will hear testimony by employees

22      of Caribbean Helicorp that they did just that.

23             You will hear testimony here, lady and

24      gentlemen of the jury, that after the investigation

25      was concluded, there were no fingerprints of Mr.

1        Jesus Rojas Tapia in that helicopter, not one. As a

2        matter of fact, the evidence will show that there

3        were no fingerprints for any of the inmates or the

4        other alleged hijacker, nor there was any other

5        evidence recovered in that helicopter, DNA or any

6        other type of evidence that could point to Mr. Rojas

7        Tapia being in that helicopter on December 30, 2002.

8              The government has talked about some guns.

9        You will hear evidence by government agents alleging

10       that they took the guns and occupied some guns when

11       they arrested Mr. Jesus Rojas Tapia in January 2,

12       2003 in a mountain range in Ponce, but you won't hear

13       evidence that there were any fingerprints either of

14       Mr. Jesus Rojas Tapia in those weapons.

15             The government, the evidence will show that

16       the government lifted dozens of fingerprints to

17       compare them with this defendant from the helicopter

18       or other parts of the helicopter. The evidence will

19       show that the helicopter had signs of blood but

20       there, and you won't hear any evidence of fingerprint

21       comparison giving a positive result or DNA comparison

22       giving a positive result with Mr. Rojas Tapia.

23             There are other facts and other evidence

24       that will be presented to you by the government in

25       this case. It is up to you to judge the evidence that

1    will be shown here and for you to determine whether

2    the crime charged, as alleged by the government

3    occurred, or if something different, drastically

4    different occurred on December 30, 2002.

5            I pray that you keep your mind open, that

6    you hear all the evidence, and when all the evidence

7    is submitted, that you enter a verdict for my client,

8    Mr. Jesus Rojas Tapia.  Thank you.

9            THE COURT: Thank you.  You may call your

10   first witness.            MS. FELDMAN: Yes, Your

11   Honor. At this time the government calls Jim Cruz

12   Castro. The government has pre-marked some exhibits

13   to save the Court some time. If I may approach your

14   clerk to--

15           THE COURT: Go ahead.

16           MS. FELDMAN: Thank you.

17                    DIRECT EXAMINATION

18   Whereupon,

19                    JIM CASTRO CRUZ

20   was called as a witness, having been duly sworn, was

21   examined and through the interpreter, testified as

22   follows:

23                    DIRECT EXAMINATION

24   BY MS. FELDMAN:

25       Q    Good morning, sir.  Would you need the

1           services of a court interpreter?

2                   A     If possible.

3                         MR. MARIANI: We are having problems with

4       the head phones when the T.V. set was turned on, the

5       screen.

6                         THE COURT:  You may proceed.

7                         MS. FELDMAN: Thank you, Your Honor.

8                         DIRECT EXAMINATION CONTINUED

9       BY MS. FELDMAN:

10                  Q     Good morning. Will you state your full

11      name.

12                  A     Jim Cruz Castro.

13                  Q     Sir, by whom are you employed?

14                  A     Caribbean Helicorp Inc.

15                  Q     How long, sir, have you worked for

16      Caribbean Helicorp, Inc.?

17                  A     Since 1994 approximately, ten, nine years.

18                  Q     Sir, what is your current position with

19      Caribbean Helicorp, Inc.?

20                  A     My duties are as Operations Director.

21                  Q     Sir, where are you from, where were you

22      born?

23                  A     Trujillo Alto, Puerto Rico.

24                  Q     You reside here on the island as well?

25                  A     Yes. That is correct.

1         Q    Where is Caribbean Helicorp located?

2         A    At the Isla Grande Airport.

3         Q    Sir, do you recall having been employed by

4  Caribbean Helicorp on December 30, 2002?

5         A    Correct.

6         Q    Were you working the whole month of

7  December or at least a good part of that month,

8  December of 2002?

9         A    That is correct.

10        Q    Sir, are you aware of the circumstances

11  that occurred on December 30, 2002 in relation to the

12  blue helicopter owned by Caribbean Helicorp?

13        A    Correct.

14        Q    Now, sir, I am going to show you a number

15  of items.  I am going to ask you to look at them and

16  to describe them.

17        A    Okay.

18        MS. FELDMAN: For the record, Your Honor, I

19  am showing the witness what has been marked by the

20  government, Government Identification one through

21  ten.

22                DIRECT EXAMINATION CONTINUED

23  BY MS. FELDMAN:

24        Q    Sir, there is a little yellow sticker there

25  on the back of each item. I am going to ask you to

1    look at the top one and tell us what numbers are on

2    that sticker.

3            A    Defendant number one.

4            Q    Sir, do you recognize the content of --

5    well, first of all, what is I.D. one? What type of

6    item is it?

7            A    Well, I understand that it is a photograph

8    of helicopter November 7 H7 Charlie Hotel which was

9    hijacked.

10            MR. MARIANI: I have an objection, Your

11    Honor.  I ask that the reference to a hijack be

12    stricken. There is no evidence in the record still in

13    this case.

14            THE COURT:  Well, there has to be some

15    time. Denied.

16            DIRECT EXAMINATION CONTINUED

17    BY MS. FELDMAN:

18            Q    Sir, let us go step by step.   Okay.

19    Government I.D. one is a photograph, right?

20            A    Correct.

21            Q    I believe that you said that there is a

22    helicopter in that photograph and you gave us the

23    serial number or the registration number is that

24    right?

25            A    Correct.

1        Q    And is that helicopter owned by Caribbean

2    Helicorp?

3        A    That is correct.

4        Q    How do you know that, sir?

5        A    Well, I recognize the facilities. I

6    recognize the helicopter and I was there personally

7    on that day and I recall all of the vehicles and all

8    of the things that were inside there.

9        Q    Now, sir, the picture that you see in front

10   of you, does it appear or does it fairly and

11   accurately depict the way that Caribbean Helicorp

12   looked on December 30, 2002?

13       A    Correct.

14            MS. FELDMAN: Your Honor, at this time I

15   move to admit Government I.D. one.

16            THE COURT:  It shall be marked.

17            MS. FELDMAN: May I remove the number, just

18   one?

19            DIRECT EXAMINATION CONTINUED

20   BY MS. FELDMAN:

21       Q    All right, we have something on the screen

22   now? Now, sir, you mentioned the blue helicopter in

23   the diagram, is that right?

24       A    Correct.

25       Q    And sir, was that the helicopter that you

1       were referring to?

2               A       Correct.

3               Q       And sir, this structure that is around the

4       helicopter, what is that structure?

5               A       Well, it is known as a hangar. It is a

6       facility where we keep all of our equipment.

7               Q       Sir, I am going to ask you now to look at

8       Government ID 2, the next item and to describe the

9       contents of that item, if you would, if you recognize

10      them.

11              A       Yes, it is basically the sign with the name

12      of our company and our telephone numbers.

13              Q       And sir, is what is contained in Government

14      ID 2, does it appear accurately and fairly to

15      represent how that sign looked in December,

16      specifically December 30th of 2002?

17              A       Correct.

18              MS. FELDMAN: Your Honor, the government

19      moves to admit Government ID 2.

20                      THE COURT:   It shall be marked.

21                              DIRECT EXAMINATION CONTINUED

22      BY MS. FELDMAN:

23              Q       Sir, the sign Caribbean Helicorp, that is

24      located on the hangar that you referred to as

25      described on the first picture?

1          A     Correct.

2          Q     Now, sir, I am going to ask you to look at

3     the next item, ID 3.  Do you recognize the content of

4     that photograph?

5          A     Correct.

6          Q     And do they accurately and fairly reflect

7     how they appeared on December 30, 2002?

8          A     Correct.

9          Q     How would you describe what in that

10    photograph, sir?

11         A     Basically it is a schedule board where we

12    write down the confirmed flight, the time of

13    departure of each flight and the destination of each

14    flight for every aircraft, specific aircraft that is

15    going to be used during that flight.

16              MS. FELDMAN:  At this time, Your Honor, I

17    move to admit Government ID 3.

18              THE COURT:  It shall be marked.

19              MS. FELDMAN: If I may publish it to the

20    jury.

21              THE COURT:  Go ahead.

22              DIRECT EXAMINATION CONTINUED

23    BY MS. FELDMAN:

24         Q     Now, sir, I am going to direct your

25    attention to the upper left hand corner of the

1    schedule board precisely as to where my pen is marked

2    here and as I am circling on the screen, the

3    position.  Do you see that position?

4         A    Correct.

5         Q    Now, sir, what does that box mean to you

6    and I am going to move it down a little bit because I

7    thin it is probably easier to see.

8         A    Well, basically the registration of the

9    helicopter appears there and the time also appears.

10   It says 8:30 A.M. which is the time of departure for

11   the helicopter and the Isla Grande airport is written

12   there but in the abbreviation which is IG on route to

13   Ponce which is PSE.

14        Q    Now, sir, on the right hand side --

15             MS. FELDMAN:  Actually I am going to move,

16   Your Honor, may I clear the screen?

17             THE COURT:  Go ahead.

18             MS. FELDMAN:  I am going to move the chart

19   over and down a little bit.

20             DIRECT EXAMINATION CONTINUED

21   BY MS. FELDMAN:

22        Q    I am going to ask you as to the

23   significance on the column marked pilot.

24        A    Well, basically what that column refers to

25   is the name of the pilot that works in the company

1          and what the mark is basically, what it contains is

2          basically the time of the expiration of the pilot's

3          certificate and the expiation of what we call the

4          check write which is from the Federal Aviation

5          Administration.

6               Q    Sir, are all of the helicopters owned and

7          operated by Caribbean Helicorp registered with the

8          Federal Aviation Administration?

9               A    Correct.

10              Q    Sir,  and this top name, whose name is

11         that?

12              A    Cruz Jim, that is mine.

13              Q    You are a pilot as well as the General

14         Manger, is that right?

15              A    Correct.

16              Q    And the second name there, who is that?

17              A    Feliciano Juan.

18              Q    And who is Juan Feliciano?

19              A    A pilot of the company.

20              Q    Now, sir, I am going to clear the screen

21         again and I am going to move the chart all the way

22         over to, to the other direction and I am going to ask

23         you the significance of the notation here on the far

24         left side.

25              A    Well, basically it says Monday, 30th and it

1       is the box that is used to identify that day, with

2       the specific flight of that day.

3              Q    Now, sir, LUN stands for "lunes" or Monday,

4       isn't that right?

5              A    Correct.

6              Q    And the number 30 refers to what, sir?

7              A    The day of the month.

8              Q    Sir,  what month calendar are we looking at

9       here?

10             A    December.

11             Q    Now, it appears that then on Monday,

12      "lunes" the 30th of December aircraft TN N747C,

13      helicopter was scheduled to go up on a reserve

14      mission or return, is that correct?

15             A    Correct.

16             Q    Now, sir, I am going to ask you to look at

17      the next photograph which is Government ID 4 and,

18      sir, is that a larger picture of what was contained

19      in the box on the previous photograph?

20             A    Correct.

21             MS. FELDMAN:  Your Honor, I move to admit

22      the document now, Government ID 4.

23             THE COURT:  It shall be marked. Do you want

24      to clear the screen?

25             MS. FELDMAN:  Thank you. If I may publish

1       it.

2                       THE COURT:  Go ahead.

3                           EXAMINATION CONTINUED

4       BY MS. FELDMAN:

5           Q    Now, sir, is that the contents of the box

6       that you described in the last item?

7           A    Correct.

8           Q    Now, what is Ing. Rojas mean to you, sir?

9           A    Engineer Rojas.

10          Q    Now, I-N-G, engineer or abbreviation for

11      engineer, that is an abbreviation that your company

12      usually uses in scheduling appointments?

13          A    Correct.

14          Q    And the appointment time that is 8:30 A.M.,

15      is it not?

16          A    Correct.

17          Q    Now, sir, I am going to ask you to look at

18      Government ID 5 which you see before you.  Does it

19      fairly and accurately represent the view of Caribbean

20      Helicorp on December 30, 2002?

21          A    Correct.

22          Q    What is contained in that photograph,

23      government ID 5?

24          A    The helicopter model is a 350 B2 which is

25      November 747 Charlie which is the registration of the

78

1    aircraft.

2         Q    Sir, do you know if those numbers that you

3    have just read are accurately reflecting the

4    registration of that helicopter that was used on

5    December 30th by the pilot, Juan Feliciano Vega?

6         A    Correct.

7         Q    And how do you know that, sir?

8         A    Well, the equipment is unique in Puerto

9    Rico. We are the sole owners.

10        Q    And is that aircraft registered to fly over

11   the air space in Puerto Rico?

12        A    Correct.

13        Q    Specifically, sir, what air space is the

14   air space over the island of Puerto Rico for Federal

15   Aviation Administration concerns?

16        A    Well, basically it would be the entire

17   measurement of the island of Puerto Rico, would be

18   135 and the literal waters which includes Vieques,

19   Desecheo, Culebra, Isla De La Mona.

20        Q    And the Federal Aviation Administration,

21   what jurisdiction does it have over the air space

22   above Puerto Rico, if you know?

23        A    Well, for aviation purposes it is governed

24   by the federal agency.

25        Q    The Federal Aviation Administration of the

1          United States, is that correct?

2                  A     Correct.

3                  Q     Now, sir --

4                       MS. FELDMAN:  I move to admit Government ID

5          5 and publish it to the jury.

6                       THE COURT:  It shall be marked.

7                       MS. FELDMAN:  Thank you.

8                            DIRECT EXAMINATION CONTINUED

9          BY MS. FELDMAN:

10                 Q     Sir, is that the aircraft that was flown by

11         Mr. Feliciano on December 30, 2002?

12                 A     Correct.

13                 Q     Now, sir, I ask you to look at what has

14         been marked as Government ID 6. Does it fairly and

15         accurately represent the contents of the Caribbean

16         Helicorp and its properties on December 30, 2002?

17                 A     Correct.

18                 Q     Can you please describe, sir, what is in

19         Government ID 6.

20                 A     Well, it is a side view of the helicopter

21         which includes the registration number which is

22         November 747 Charlie Horse Charlie.

23                 Q     Sir, does that registration refer to the

24         helicopter which is depicted in Government ID 5?

25                      THE COURT:  Six.

1          MS. FELDMAN:  Excuse me, Exhibit 5.

2          THE WITNESS: Correct.

3          MS. FELDMAN:  Your Honor, I move to admit

4    Government ID 6 and publish it to the jury.

5          THE COURT:  It shall be marked.

6          MS. FELDMAN:  Thank you.

7                    DIRECT EXAMINATION CONTINUED

8    BY MS. FELDMAN:

9          Q    Sir, that is a side view of the same

10   helicopter, is it not?

11         A    Correct.

12         Q    With the registration number on the top

13   portion of the helicopter, is that correct?

14         A    Correct.

15         Q    Sir, I am going to ask you to look at the

16   next item. That is Government ID 7 I believe and does

17   that accurately represent the way it looked on

18   December 30, 2002 in the hangar of Caribbean

19   Helicorp?

20         A    That is correct.

21         Q    What is contained in that item, sir?

22         A    The photograph, the side view. The door is

23   open in the helicopter.

24         MS. FELDMAN:  Your Honor, I move to admit

25   what has been marked as Government ID 7 and publish

1    it.

2              THE COURT:  You may mark it.

3                    DIRECT EXAMINATION CONTINUED

4    BY MS. FELDMAN:

5         Q    As you said, sir, that is the other side of

6    the helicopter, is it not?

7         A    Correct.

8         Q    Now, sir, do you know of any other blue

9    helicopters that are owned and operated outside of

10   the Isla Grande airport?

11        A    No.

12        Q    The next item that you see before you, sir,

13   Government ID 8, does it fairly and accurately

14   reflect the property of the hangar at the Caribbean

15   Helicorp on December 30, 2002?

16        A    Well, basically what it represents is what

17   we call a black card of the helicopter where the

18   manufacturer describes the serial number and the

19   model of the equipment.

20        Q    And sir, what piece of equipment are you

21   referring to?

22        A    In this case it is AS350B2,AS350B2 and

23   serial number 157 which pertains to the helicopter

24   that we saw in the previous photograph.

25        Q    Sir, is a helicopter considered an aircraft

1      to the best of your knowledge?

2              A      Yes, that is correct.

3              Q      And how do you know that, sir?

4              A      We know that because the Federal Aviation

5      Administration assigns a registry and what we call an

6      air boarding certificate and that is what designates

7      each aircraft with a specific model as an aircraft.

8              Q      Sir, have you heard the term special

9      aircraft jurisdiction?

10             A      Yes.

11             Q      What does that mean to you, sir?

12             A      Jurisdiction or registration?

13             Q      Jurisdiction, sir.

14             A      Could you repeat the question?

15             Q      Well, sir, you indicated that a helicopter

16     is an aircraft for purposes of the FAA, for the

17     Federal Aviation Administration.    Do you know what

18     the aircraft jurisdiction of the special aircraft

19     jurisdiction would be for a helicopter such as this?

20             A      Well, in this specific case, the Federal

21     Aviation Administration designated this helicopter as

22     part of the Caribbean Helicorp fleet to carry out

23     special flights, commercial flights.

24                    MS. FELDMAN:   Sir, I am going to ask you, I

25     am going to move to admit the contents or the item,

1    Government ID 7 and to publish it to the jury.

2            THE COURT:  Go ahead.

3                    DIRECT EXAMINATION CONTINUED

4    BY MS. FELDMAN:

5        Q    Sir, this is basically, where is it

6    located, sir?

7        A    I understand that it is on the right hand

8    side of the helicopter on the back.

9        Q    And I believe although it is a little

10   unclear, correct me if I am wrong, the model

11   designation is AS350B2, is that correct?

12       A    Correct.

13       Q    Now, sir, I am going to ask you to look at

14   the next item, Government --

15           THE COURT:  Let me ask you this, comparing

16   it to a car, this would be like the model number of

17   the car in the motor, whatever and it is N27C, N747CH

18   would be like the plates of the car?

19           THE WITNESS: That is correct.

20                   DIRECT EXAMINATION CONTINUED

21   BY MS. FELDMAN:

22       Q    All right, on number nine, that is a fair

23   and accurate depiction or does it look like the way

24   it looked in December 20, 2002?

25       A    Correct.

1          Q    Will you please describe, sir, the contents

2     of the item?

3          A    Basically the rear part of the helicopter

4     with the two doors opened where the four passenger's

5     seats are depicted, four passenger's seats of the

6     helicopter are depicted.

7          Q    And sir, you are referring to the same

8     helicopter that we have been talking about so far

9     this morning?

10         A    Correct.

11              MS. FELDMAN:  Your Honor, I move to admit

12    Government ID 9 and to publish it to the jury.

13              THE COURT:  It shall be marked.

14                   DIRECT EXAMINATION CONTINUED

15    BY MS. FELDMAN:

16         Q    So, basically, sir, that is the back seat

17    of the aircraft, is that right?

18         A    Correct.

19         Q    How many people seat in the front seat, if

20    you know?

21         A    Including the pilot, two.

22         Q    So, how many in total are permitted by

23    regulation to seat in the aircraft?

24         A    Well, it would be five passengers, one

25    pilot.

1    Q    Now, sir, I am going to ask you to look at

2    the next photograph, I believe it is the last one and

3    I am going to ask you, sir, if it fairly and

4    accurately depicts the image as it looked on December

5    30, 2002?

6        A    Correct.

7        Q    Please describe the contents of that item,

8    sir?

9        A    It is one of the back doors of the

10    helicopter which gives you access or entrance to the

11    back seat on the rear. I understand that this is the

12    left, the door on the left hand side.

13    I am sorry, the right one.

14        MS. FELDMAN:  Your Honor, I move to admit

15    this as exhibit and to publish it to the jury.

16        THE COURT:  It shall be marked.

17                DIRECT EXAMINATION CONTINUED

18    BY MS. FELDMAN:

19        Q    Sir, I am showing you Exhibit 10 or what

20    has been entered into evidence as 10.  This door to

21    the helicopter, is it the one that belonged to the

22    blue helicopter that was flown by Juan Feliciano on

23    December 30, 2002?

24        A    Correct.

25        Q    Sir, why is that door off the helicopter?

1                    MR. MARIANI: Lack of foundation, judge, if

2       he knows.

3                    MS. FELDMAN:  If he knows.

4                    MR. MARIANI:  That is hearsay, Your Honor.

5                    THE COURT:  Denied.

6                    THE WITNESS: From what I remember of what

7       was told--

8                    THE COURT:  What did you see on that day?

9                    THE WITNESS: Well, when I arrived at the

10      facilities, the helicopter was there with the door

11      out outside and what he was told was that --

12                    MR. MARIANI: Hearsay, Your Honor.

13                    THE COURT:  Sustained.

14                         DIRECT EXAMINATION CONTINUED

15      BY MS. FELDMAN:

16          Q    At this time, sir, I am going to show you

17      some other documents. What have been pre-marked ID

18      11, 12, 13 and 14. I am going to ask, sir, to take a

19      look at those documents and I am going to ask you

20      about Exhibit number 11.  Have you had an

21      opportunity, sir, to look at the documents?

22          A    Yes.

23          Q    What is the document marked for

24      Identification as 11?

25          A    Basically that is what is known as the

1     registration, certificate of the equipment,

2     specifically November 747 Charlie Hotel which was the

3     helicopter that we saw previously.

4          Q    Sir, does that registration or the document

5     in front of you pertain to the helicopter that we

6     have been talking about for the last hour?

7          A    Correct.

8               MS. FELDMAN:  Your Honor, I move to admit

9     Item number 11.

10              THE COURT:  It shall be marked.

11                    DIRECT EXAMINATION CONTINUED

12    BY MS. FELDMAN:

13         Q    Sir, it appears that this registration is

14    issued to Caribbean Helicorp, is that correct?

15         A    Correct.

16         Q    And again, the same number of the

17    registration that was on the plaque on the aircraft

18    is mentioned on this registration form, is that also

19    correct?

20         A    Correct.

21         Q    Okay. So, I am going to ask you to look at

22    the next item -- one last thing, on the bottom here,

23    on the corner, sir, it says U.S. Department of

24    Transportation Federal Aviation Administration, is

25    that right?

1          A     Correct.

2          Q     And is that the agency to which the

3     helicopter sought its registration?

4          A     Correct.

5          Q     Okay. Now, the next item, sir, government

6     ID 12, what is that document?

7          A     That is what is called an air carrier

8     certificate. It is  issued by the Federal Aviation

9     Administration, and basically what it does is assign

10    Caribbean Helicorp the authority to carry out

11    commercial flights.

12                MS. FELDMAN:  Your Honor, I move to admit

13    government ID 12.

14                THE COURT: It shall be marked.

15                     EXAMINATION CONTINUED

16    BY MS. FELDMAN:

17         Q     And sir, referring just for a moment back

18    to ID eleven, I noticed that the date of issue on

19    government evidence item eleven is August 24, 1999,

20    is that correct sir?

21         A     Correct.

22         Q     So, is that the date of the first

23    registration of the helicopter, the blue helicopter?

24         A     That is the date on which the final

25    transaction was carried out for the purchase of the

1    helicopter from the manufacturer.

2         Q    To Caribbean Helicopter, is that right?

3         A    Correct.

4         Q    Okay. Now, what you identified as the air

5    carrier certificate, sir, that also indicates

6    Caribbean Helicorp, isn't that correct?

7         A    Correct.

8         Q    And once more sir, what is the significance

9    of the document, the air carrier certificate?

10        A    Basically, it is issued to the company by

11   the Federal Aviation Administration and what it

12   allows is the company to be able to carry out

13   commercial flights.

14        Q    Okay. Now, sir, government ID 13, the next

15   document in front of you, can you please describe

16   that document?

17        A    Yes, it is what we know as a standard air

18   worthiness certificate. It is also issued by the

19   Federal Aviation Administration. What it means

20   basically, is that the equipment is fit for flying.

21   That is basically what it is.

22        MS. FELDMAN:  Your Honor, I move to admit

23   Government ID 13.

24             THE COURT: It shall be marked.

25             MS. FELDMAN: And to publish it to the jury.

1          THE COURT: Go ahead.

2               EXAMINATION CONTINUED

3   BY MS. FELDMAN:

4        Q    I am going to blow it up a little bit here,

5   sir. Now, this standard air worthiness certificate,

6   Government Exhibit 13, refers to what aircraft, sir?

7        A    November 747 Charlie Hotel, the helicopter

8   that we have been talking about.

9        Q    And sir, I'm going to circle something in

10  red. The description that you gave, is that a

11  shortened version or an acronym for the helicopter

12  that we are referring to?

13       A    Correct.

14       Q    And again, these same make and model

15  numbers are reflected on the standard air worthiness

16  certificate, are they not?

17       A    Correct.

18       Q    Now, sir, I am going to ask you to look at

19  the next document, Government Exhibit 14 for

20  identification and describe that document, sir.

21       A    Basically, it is what is called a bill of

22  sale, and it is issued by the manufacturer to the

23  purchaser, in this case Caribbean Helicorp, on the

24  day of the purchase to American Helicopter, and it

25  also has a registration number of the helicopter that

1    we have been talking about, the model and the serial

2    number.

3              MS. FELDMAN:  Your Honor, I move to mark

4    that number.

5              THE COURT: It will be marked.

6              MS. FELDMAN: And to publish it to the jury.

7              THE COURT: Go ahead.

8                        EXAMINATION CONTINUED

9    BY MS. FELDMAN:

10        Q    Now, this bill of sales, sir, appears to

11   reflect that Caribbean Helicorp, circled here in the

12   middle, purchased the same helicopter which is

13   described above that we have been talking about, is

14   that right?

15        A    Correct.

16        Q    Now, sir, there are some other items that

17   are being marked that I am going to ask you to look

18   at, and I am going to ask you to describe what has

19   been marked Government ID 15 first.

20              Sir, have you seen that document before?

21        A    Correct.

22        Q    What is Government ID 15 first?

23        A    It is basically a sheet of paper that is

24   filled out by the company for each flight, and

25   basically, what it represents is the day of the

1    flight, the equipment that was used, the pilot that

2    carried out the flight, the customer that used the

3    service, the flight route, the time at which it

4    arrived or it reported at every moment, and the

5    number of passengers.

6        Q    And, does that look like the original

7    document?

8        A    Correct.

9        Q    How do you know that, sir?

10       A    Well, I know it because of the type of form

11   that it is. I recognize the handwriting of the person

12   who did it.

13       Q    Whose handwriting is that?

14       A    In this case it was Luz Anglero.

15       Q    And sir, does that document pertain to the

16   incident that occurred in the end of December,

17   specifically December 30, 2002?

18           MR. MARIANI: I have an objection, Your

19   Honor. It hasn't been admitted into evidence, that

20   document, still and counsel is going to its contents.

21           THE COURT: Denied.

22           THE WITNESS: That is correct.

23           MS. FELDMAN: At this time I move to

24   admit the document.

25           THE COURT: It shall be marked.

1              MR. MARIANI: Your Honor, we have an

2      objection.

3              THE COURT: Go ahead.

4              MR. MARIANI: The document was prepared

5      by Ms. Anglero and the witness has identified the

6      handwriting, but he cannot assure, what is written

7      there.  He didn't write it.

8              THE COURT: Denied. It shall be marked.

9              MS. FELDMAN: If I may publish it to

10     the jury, Your Honor.

11                     EXAMINATION CONTINUED

12     BY MS. FELDMAN:

13        Q    Now sir, I am showing you Government

14     Exhibit 15, the helicopter flight report. Can you

15     please explain the notations on this form?

16             THE COURT: Is that a form that is used by

17     your company?

18             THE WITNESS: Yes, that is correct.

19             THE COURT: All right.

20                     EXAMINATION CONTINUED

21     BY MS. FELDMAN:

22        Q    And usually, Luz, the lady that you talked

23     about, completes the form, is that right?

24        A    That is correct.

25        Q    Now, sir, what is the significance, what

1    does it mean, all these notes on this form?

2         A    Well, to begin and to be a little more

3    specific; as you can see, it says up there Helicopter

4    Flight Following Report.

5         Q    And sir, I am going to interrupt you for a

6    minute. Any time you want to make note of a specific

7    line, you can just touch the screen hard and it will

8    make a note, okay.

9              So, I'm going to take that off so if you

10   want to go to a particular line, and if I may

11   approach the witness just for the first notation,

12   Your Honor?

13              THE COURT:  Go ahead.

14                   EXAMINATION CONTINUED

15   BY MS. FELDMAN:

16        Q    Oh, he has got it, okay. Where you made the

17   X sir, what does that denote?

18        A    Well, basically, well, what it says there

19   is location and ETA exposition which means basically

20   where the helicopter landed and at what time it

21   landed.

22        Q    Now sir, are we referring to the same blue

23   helicopter?

24        A    That is correct.

25        Q    How do you know that, sir?

1          A    Well, I know it because it says the

2     aircraft number or the registration, November 747

3     Charlie Hotel.

4          Q    And that is up in the upper right hand

5     corner, right?

6          A    Correct.

7          Q    Okay. Please continue your explanation,

8     sir, of the meaning of this form.

9          A    Well, basically, the person in charge, in

10    this case, Ms. Luz Anglero, every time the helicopter

11    leaves the airport and arrives at a certain place,

12    the pilot has to get in touch with the facilities,

13    specify where he is at and at what time he landed

14    there. This is used and required by the Federal

15    Aviation Administration in case that at a given

16    moment the pilot or the helicopter does not, do not

17    report, and a certain amount of time has elapsed,

18    search endeavors are conducted because it is

19    understood that the aircraft is missing.

20         Q    And sir, what is the date of this report?

21         A    December 30, 2002.

22         Q    That is reflected on the upper left hand

23    corner, right?

24         A    Correct.

25         Q    What does SIG on the second line indicate?

1          A     Isla Grande Airport. That is the acronym

2     for Isla Grande Airport?

3               THE COURT: And what does the DEPT stand

4     for?

5               THE WITNESS: DEPT means departure place.

6               THE COURT:  Which is?

7               THE WITNESS: Our home base.

8               THE COURT: It says SIG?

9               THE WITNESS: SIG.

10              THE COURT: Okay.

11                   EXAMINATION CONTINUED

12    BY MS. FELDMAN:

13         Q     So, it appears that the aircraft departed

14    at 8:45, right?

15         A     Correct.

16         Q     And the ETA stands for what, sir?

17         A     Nine forty five, and it is understood to be

18    the time of arrival of the helicopter.

19         Q     So does it appear that the aircraft

20    returned at around that time, sir?

21         A     Correct.

22         Q     Okay. Now, it appears that the pilot that

23    day was Juan Feliciano, right?

24         A     Correct.

25         Q     And who was the customer on that date, sir,

97

1     on December 30, 2002?

2              A     Engineer Jesus Rojas.

3              Q     And the route of flight, sir, what was

4     that?

5              A     The route of flight says it is Isla Grande

6     direct to Ponce, specifically El Tuque, and from El

7     Tuque it returned to Isla Grande.

8              Q     And sir, what do the times 9:15 and 10:05

9     reflect?

10             A     Nine fifteen reflects the time on which the

11    helicopter landed in Jayuya, and 10:05 means the time

12    that it landed in Isla Grande.

13             Q     And sir, what is this lower section?

14             A     That is where we write down the names of

15    the passengers.

16             Q     And who was the passenger on that date?

17             A     Engineer Jesus Rojas.

18             Q     And what is the significance of where it

19    says "plus one pas"?

20             A     Plus one passenger.

21             Q     Is that a standard abbreviation, sir?

22             A     Yes.

23             Q     Sir, I am going to ask you to look at the

24    next item, Government ID 16. Excuse me, I believe it

25    is a large document and sir, do you recognize that

98

1    document?

2          A     Correct.

3          Q     What is that document?

4          A     Basically it is a sheet from a calendar

5    where we write down the assigned flights.

6                THE COURT: Confirmed flights.

7                THE INTERPRETER: I mean, confirmed flights.

8                THE WITNESS: For example, a passenger calls

9    in and says, "I need a helicopter to be available for

10   such and such a date", we check the date to see if

11   the helicopter or the plane is available, if it is, a

12   document is sent to the passenger, and when he

13   confirms it is written down on a schedule.

14               EXAMINATION CONTINUED

15   BY MS. FELDMAN:

16         Q     And sir, what is reflected with regard to

17   the blue helicopter?

18         A     Well, are you referring specifically to

19   December 30th?

20         Q     Specifically sir, December 30, 2002, what

21   is reflected on that original calendar?

22               MR. MARIANI: Your Honor, the document is

23   not in evidence.

24               THE COURT: Sustained.

25               EXAMINATION CONTINUED

1    BY MS. FELDMAN:

2        Q    Sir, does that document fairly and

3    accurately reflect the way the calendar and schedule

4    looked on December 30th, 2002?

5        A    Correct.

6        Q    To the best of your knowledge, sir, have

7    any changes been made to that document since December

8    30, 2002?

9        A    No.

10       Q    And sir, after the incident that took place

11   on December 30, 2002, do you recall if anyone came to

12   Caribbean Helicorp and asked you or other individuals

13   at Caribbean Helicorp for the original document?

14           MR. MARIANI: I have an objection as to the

15   form, he or other individuals, he can testify as to

16   himself not as to what other people were asked for

17   that day.

18           THE COURT: No, the question was were they,

19   he or other individuals asked for that document, if

20   he knows.

21           THE WITNESS: Correct.

22                    EXAMINATION CONTINUED

23   BY MS. FELDMAN:

24       Q    Do you know what agency or in general, who

25   were the people who asked for the document?

1          A      FBI.

2          Q      And do you know if the documents were given

3    on December 30th, to the FBI?

4          A      Correct.

5          Q      And sir, since December 30th, do you see

6    any changes having been made to that document?

7          A      No.

8          MS. FELDMAN:  At this time, Your Honor, I

9    move to admit government ID 16.

10          THE COURT: It will be marked.

11                    EXAMINATION CONTINUED

12    BY MS. FELDMAN:

13          Q      So now, you can keep that document, please

14    describe December 30, 2002, and the significance of

15    that date to that calendar that you see in front of

16    you.

17          A      Well, basically, on December 30, 2002, two

18    flights appear here, a flight to Miami from Isla

19    Grande appears here, and a flight of mister, of

20    Engineer Rojas appears here departing at 8:30 AM, a

21    flight to Ponce, a flight which should last one hour.

22          Q      Okay. If you don't mind handing that to the

23    court officer, I'm going to show you another item,

24    and you can take a moment to look at that, item

25    number 17 or ID. And sir, before we go to the next

1    item, I'm going to fold the calendar, the Government

2    Exhibit 16 to I believe the portion you are referring

3    to, and I'm going to ask you if in fact the section

4    that I'm referring to is the reservation that was

5    made for Caribbean Helicorp for December 30, 2002?

6        A    Correct.

7        Q    Is that the reservation to which you

8    referred regarding Engineer Rojas?

9        A    Correct.

10       Q    And that is marked where I am circling it,

11   is it not?

12       A    Correct.

13       Q    Now, sir, the next item that you see in

14   front of you, what is that item?

15       A    It is what is known as a flight log.

16       Q    And what is a flight log?

17       A    Basically, it is something that is required

18   by the Federal Aviation Agency to record and

19   evidence--

20           THE COURT: Keep a record.

21           INTERPRETER: Or keep a record.

22           THE WITNESS: Of the flight that was made by

23   a certain aircraft, and specifically to be able to

24   carry out the maintenance of the equipment due to the

25   hours that the machine has been in flight.

1                    EXAMINATION CONTINUED

2      BY MS. FELDMAN:

3           Q    And specifically, sir, does that flight log

4      reflect any particular date as having been used?

5           A    No.

6                MR. MARIANI: I have an objection, Your

7      Honor. She is going into the contents of the document

8      and it hasn't been admitted into evidence.

9                THE COURT: He answered the question

10     already. Next question.

11                   EXAMINATION CONTINUED

12     BY MS. FELDMAN:

13          Q    Sir, was that item retrieved by anyone from

14     Caribbean Helicorp?

15          A    Correct.

16          Q    Who received that item, if you know?

17          A    I don't recall the specific person, but it

18     was the FBI.

19          Q    Do you know when that item was retrieved

20     more or less, on what date?

21          A    December 30, 2002.

22          Q    And does it appear to be in the same

23     condition as when it was retrieved or taken from

24     Caribbean Helicorp?

25          A    Correct.

1      Q      And sir, does that flight log pertain to

2  any particular aircraft?

3      A      Correct.

4      Q      What aircraft, sir?

5      A      November 747 Charlie Hotel, the aircraft

6  that we have been talking about.

7      Q      And how do you know that, sir?

8      A      The form, the notebook has the number of

9  the helicopter written down, and it is written down

10  on the form and where it says "aircraft number".

11          MS. FELDMAN:  Your Honor, I move to admit

12  this item, Government ID 17.

13          THE COURT: It shall be marked. Let's take a

14  ten minute break, lady and gentlemen of the jury.

15       (Whereupon a recess was taken)

16          MS. FELDMAN: Thank you, Your Honor. I

17  believe that item 17 was admitted into evidence?

18          THE COURT: It was.

19          MS. FELDMAN: Thank you.

20              EXAMINATION CONTINUED

21  BY MS. FELDMAN:

22      Q      And sir, the item 17 in evidence, that is

23  the log pertaining to the blue helicopter that we

24  have been discussing, is that right?

25      A      Correct.

1       Q    And you know that how, sir?

2            MR. MARIANI: Your Honor, can I be excused

3       just a second? Okay.

4                    EXAMINATION CONTINUED

5       BY MS. FELDMAN:

6       Q    Sir, I believe you testified that you know

7       that because the number for the same helicopter is

8       written at the top of that log, is that correct, the

9       clipboard?

10      A    Correct.

11           THE COURT: Is that the only reason why you

12      know that?

13           THE WITNESS: It is written on the notebook.

14      It has a blue sticker corresponding to the blue

15      helicopter, and it is written by hand in the area

16      where it says "aircraft number" on the upper part.

17           THE COURT: Have you seen that before?

18           THE WITNESS: Correct.

19           THE COURT: Where?

20           THE WITNESS: Well, that's the form that we

21      use, assigned to us by the Federal Aviation Agency.

22           THE COURT: Where have you seen it before?

23           THE WITNESS: We use it every day.

24           THE COURT: In your office?

25           THE WITNESS: Correct.

1          THE COURT: As part of the records of your

2     corporation?

3          THE WITNESS: Correct.

4                    EXAMINATION CONTINUED

5     BY MS. FELDMAN:

6          Q     And sir, the number that refers to the

7     helicopter, is that the number that appears on the

8     top?

9          A     Correct.

10          Q     Now, sir, prior to December 30, 2002, did

11     you have occasion to take a phone call in relation to

12     the use of the helicopter on December 30, 2002?

13          A     Correct.

14          Q     Can you please explain to the jury what

15     information you received in relation to the use of

16     the helicopter on December 30, 2002?

17          A     On the previous saturday, I understand that

18     it was about one o'clock in the afternoon, I received

19     a phone call from a lady--

20          Q     And the Saturday before, do you recall the

21     date?

22          A     Twenty eighth.

23          Q     Okay. You received a phone call from a

24     lady, is that right?

25          A     Correct.

1      Q     What happened next, sir?

2      A     The lady asked about helicopter services

3   and asked how much it would cost to go to Ponce to

4   take some photographs of a construction area. I gave

5   her the information, the cost would be $1,000. I

6   asked her if they were going to land anywhere else

7   and she said no, she said that it was only a matter

8   of taking the photographs and they would come back to

9   San Juan. She asked me how she could make the

10  payment.  I told her it had to be by means of a

11  credit card. She told me she didn't have access to

12  one at that moment, however, that Engineer Rojas, who

13  was the person who was going to use the helicopter,

14  was going to pay by means of a check on that very day

15  of the flight.

16            I asked her when the flight was going to

17  take place and she said in the next Monday which was

18  December 30th. I told the lady to call on Monday

19  morning to confirm with the secretary, Luz Anglero.

20     Q     And do you know if she did call?

21     A     I understand that she did not call.

22     Q     After you received the call and the

23  reservation for the rental of the helicopter for

24  Monday the 30th of December, what did you do?

25     A     Well, immediately thereafter I called Luz

1    Anglero, I told her about the flight, and after that

2    I proceeded to call Juan Feliciano, the pilot, and I

3    gave him the instructions, and I told him not to take

4    off unless he received the payment.

5        Q    Sir, does Caribbean Helicorp also accept

6    cash payments?

7        A    Correct.

8        Q    So if someone were to walk in with a

9    thousand dollars in cash, that person could receive a

10   ride such as the individual on the phone who may not

11   have had access to a credit card, is that right?

12       A    Correct.

13       MS. FELDMAN:  I have no further questions

14   of this witness, Your Honor.

15       THE COURT: You may cross.

16       MR. MARIANI: Your Honor, I would like to

17   ask the government if there is prior statements for

18   this witness. We have not received any as of today.

19       MS. FELDMAN: Your Honor, obviously we can

20   discuss this in open court and counsel and I have

21   discussed this previously.  If the Court wishes me to

22   do, I would be more than happy to address it now.

23       THE COURT: Approach the bench.

24       (At the bench)

25       MS. FELDMAN:  There are no sworn statements

1    per say.  He was interviewed.  I have a 302 that was

2    provided.

3              THE COURT:  There is no sworn statement?

4    There is no Jenks statement?

5              MS. FELDMAN:  No.

6              MR. MARIANI: But a redacted 302 with regard

7    to this witness.

8              THE COURT:  But there is no sworn statement

9    on the part of this witness.

10             MS. FELDMAN:  If counsel wishes a copy I

11   have a redacted copy. I have to redact it and he can

12   borrow my copy.

13             THE COURT:  A copy of what?

14             MS. FELDMAN:  302 pertaining to an

15   interview butt here is no sworn statement.  There is

16   an interview of this witness but the report is

17   written by the task force agent.

18             THE COURT:  Was it adopted by this witness?

19             MS. FELDMAN:   I doubt that it would be.

20             THE COURT:  The witness said, "Yes, that is

21   my statement." He reviewed the 302.

22             MS. FELDMAN:  No, there is no statement.  I

23   cna show counsel my copy if he wants.

24             THE COURT:  All right.

25             MR. MARIANI: That would be enough for me.

1           THE COURT:  All right.

2           (In open Court)

3           MS. FELDMAN: For the record, I will be

4    handing to counsel, I will be providing counsel with

5    a coy, just so the court knows what I'm doing, I'm

6    taking off this witness' home address, his Social

7    Security number, and his telephone since I believe

8    that is personal information.

9           THE COURT: Just do what you have to do.

10          MR. MARIANI: If I may please the Court.

11          THE COURT: Go ahead.

12                    CROSS EXAMINATION

13   BY MR. MARIANI:

14      Q    Mr. Castro, good morning.

15          THE COURT:  Cruz, Mr. Cruz.

16                    CROSS EXAMINATION

17   BY MR. MARIANI:

18      Q    Mr. Cruz, I'm sorry. Good morning, Mr.

19   Cruz.

20      A    Good morning.

21      Q    Upon questions by counsel for the

22   government, you were testifying as to a telephone

23   call that you received Saturday, December 28, 2002?

24      A    Correct.

25      Q    Isn't it true that, strike that -- when

1       this lady called you on December 28, 2002 and asked

2       you that she wanted to charter a helicopter, you say,

3       you answered to questions from counsel for the

4       government that you notified the secretary, Ms. Luz

5       Anglero and the pilot, Mr. Feliciano?

6              A     Correct.

7              Q     Do you remember when you notified Ms.

8       Anglero?

9              A     Right after the call.

10             Q     And you said that you called Ms. Anglero to

11      tell her of this new reservation?

12             A     Correct.

13             Q     But isn't it a fact that Ms. Anglero works

14      at the same office as you in Isla Grande?

15             A     Not on Saturdays and Sundays.

16             Q     So even when Ms. Anglero was free on

17      Saturday, you called her at her cell phone or at her

18      house?

19             A     Correct.

20             Q     And isn't it a fact, sir, that upon

21      receiving the call from this lady on December 28,

22      2002, you did not write down in the calendar that has

23      been marked as an exhibit, the reservation, isn't

24      that true?

25             A     Yes, it was written down.

1        Q    But the fact is that you yourself didn't

2   write that down?

3        A    Yes, I personally did it.

4        Q    So the handwritten part regarding the--

5             THE COURT: Which, I'm sorry, which exhibit

6   are you referring to? There are various exhibits that

7   have--

8             MR. MARIANI: Exhibit 16, Your Honor.

9             THE COURT: Okay.

10            MR. MARIANI: May we have Exhibit 16?

11            THE COURT: Yes.

12                        CROSS EXAMINATION CONTINUED

13  BY MR. MARIANI:

14       Q    I have shown, provided you what has been

15  marked as Government Exhibit 16 in this case. Is that

16  the calendar where you wrote down the reservation for

17  December 30, 2002?

18       A    Correct.

19       Q    Isn't it true that in that document on the

20  same date, December 30, 2002, there is a white part

21  with liquid paper or some other wipe part substance,

22  is that true?

23       A    True, correct.

24       Q    And did you use that liquid paper or wipe

25  out?

1        A    I remember that I did, yes.

2        Q    And what was what you wiped out before

3    writing down the reservation?

4        A    It could have been the previous flight or

5    what was written.

6            MS. FELDMAN: Objection, Your Honor--

7            THE COURT: Wait a minute.

8            MS. FELDMAN: I would just ask that the

9    witness be permitted to answer the question before

10    counsel proposes another question.

11                 CROSS EXAMINATION CONTINUED

12    BY MR. MARIANI:

13        Q    So, you don't remember what you wiped out

14    before writing the reservation for December 30, 2002?

15        A    No.

16        Q    You also stated, upon questions by counsel

17    for the government that once, that your company

18    policy, Caribbean Helicorp policy is that once a

19    reservation is made via telephone, a confirmation

20    notice is sent to the person who makes the

21    reservation, do you remember your testimony?

22        A    Correct.

23        Q    I ask you, if it isn't true that on

24    Saturday December 28, 2002 you did not prepare a

25    written confirmation for that, the reservation that

1    was made for December 30, 2002?

2        A    Correct.

3        Q    And as a matter of fact, besides that

4    handwritten note in the calendar that you have

5    testified including, you did not prepare any other

6    document within the Caribbean Helicorp files

7    regarding the reservation of December 30, 2002?

8        A    Except for what I wrote on the calendar and

9    on the schedule board.

10        Q    So besides those two annotations that you

11    made, you didn't prepare any other document?

12        A    No.

13        Q    And you said that you contacted the pilot?

14        A    Correct.

15        Q    But the fact is that you didn't contact the

16    pilot until the morning hours of December 30, 2002 to

17    tell him that he had a flight on that same day?

18        A    Nope, it was done on the same day of the

19    confirmation, Saturday the 28th.

20        Q    And how did you do that, you left a message

21    on his phone machine or were you able to talk to him?

22        A    If I recall correctly, I spoke with him.

23        Q    Do you remember what you told him, what you

24    told the pilot?

25        A    Yes, I told him that a call had been

1    received for a flight for Monday the 30th, an

2    engineer, and the flight was going to be to Ponce and

3    it was going to be for an hour, and they were going

4    to take photographs of a project under construction

5    and then they were going to return to San Juan.

6         Q    And you told him that they were going to

7    take some photographs of a race track?

8         A    Correct, it was a project that was being

9    developed at that time.

10        Q    So you specified to the pilot that there

11   was a project going on in Ponce, in El Tuque, and you

12   told him that it was in El Tuque recreational area

13   there?

14        A    Correct.

15        Q    Okay. So the pilot knew exactly where he

16   was going since December 28, 2002?

17        A    Correct.

18        Q    On questions by counsel for the government

19   you testified that you are a pilot, isn't that true,

20   Mr. Cruz?

21        A    Correct.

22        Q    And how many years have you been a pilot?

23        A    Thirteen years.

24        Q    And upon questions by counsel for the

25   government, you also testified regarding some FAA

1    regulations, Federal Aviation Administration

2    regulations, do you remember that?

3         A    Correct.

4         Q    And during those 13 years as a pilot you

5    have been dealing and abiding those FAA regulations?

6         A    Correct.

7         Q    So I can say that you know pretty well FAA

8    regulations?

9         A    Correct.

10         Q    And also you testified upon questions by

11    counsel for the government regarding the air space,

12    Puerto Rico air space, you remember your testimony?

13         A    Correct.

14         Q    That that air space included the island of

15    Puerto Rico, the water surrounded Puerto Rico--

16              THE COURT: No, he didn't say water,

17    counsel. He the coastline, and the islands. He didn't

18    say the waters.

19              MR. MARIANI: Thank you, I stand corrected,

20    Your Honor.

21              THE COURT: All right. If you are going to

22    quote him, you better quote him, exactly what he

23    said.

24              MR. MARIANI: Okay.

25              THE COURT: All right.

1                    CROSS EXAMINATION CONTINUED

2    BY MR. MARIANI:

3        Q     So you testified what Your Honor has stated

4    regarding Puerto Rico air space?

5        A     Correct.

6        Q     You remember that. And as a matter of fact,

7    there are federal regulations concerning how

8    equipment helicopters and airplanes, aircraft are

9    handled within the Puerto Rico air space?

10       A     Correct.

11       Q     And those regulations, tell me if you agree

12   with me that those regulations vary somewhat

13   depending on where in the air space in Puerto Rico

14   you are?

15       A     I don't understand your question.

16       Q     I'm asking if you would agree with me that

17   some federal regulations concern approaches to major

18   airports as other federal regulations concern flying

19   to areas which are not covered under a radar or under

20   a traffic control tower close to a major airport?

21            MS. FELDMAN: Objection, Your Honor,

22   relevance.

23            THE COURT: I'm going to allow it to

24   see where he is going.

25            THE WITNESS: Well, yes, I am familiar

1    with that and I understand that, I mean, I know how

2    it operates, that it is the same way.

3                    CROSS EXAMINATION CONTINUED

4    BY MR. MARIANI:

5         Q    Okay. And Isla Grande Airport, where

6    Caribbean Helicorp operates, tell me if it isn't true

7    that that airport has a traffic control tower?

8         A    Yes, it has a control tower.

9         Q    And tell me it isn't true that pilots of

10   both airplanes and helicopters have to contact that

11   air traffic control tower when it is operating to

12   depart and to arrive at the Isla Grande airport?

13        A    Correct.

14        Q    And tell me if it isn't true also that

15   pilots departing for commercial flights as the one

16   that you have testified occurred on December 30, 2002

17   -- Let me rephrase the question.

18             The flight on December 30, 2002 in which

19   Juan Feliciano was the pilot, was that a commercial

20   flight?

21        A    Correct.

22        Q    It was not a private flight?

23        A    No.

24        Q    And FAA has specific regulations concerning

25   commercial flights instead of private flights?

1          A    It depends on the regulations that regulate

2     each flight.

3          Q    And tell me if it isn't true that the FAA

4     regulations require Mr. Feliciano or Caribbean

5     Helicorp to contact the FAA San Juan radio or flight

6     service station in San Juan and to notify before

7     departure of the flight plan of all commercial

8     flights?

9          A    No.

10         Q    Nope? How that operate then, Mr. Cruz.

11              THE COURT: As to this flight, as to this

12     flight.

13              MR. MARIANI: As to the flight of December

14     30, 2002.

15              MS. FELDMAN: if he knows, Your Honor.

16              MR. MARIANI: If you know.

17              THE WITNESS: No, that isn't correct. The

18     way the company operates, and the way it is governed

19     by the regulations of the FAA, we are allowed to

20     prepare a flight following report, which was the

21     document we showed at the beginning, therefore, it is

22     not necessary to do it through a flight service

23     station for a local flight, given the fact that it is

24     a visual flight.

25              CROSS EXAMINATION CONTINUED

1    BY MR. MARIANI:

2        Q    For the ladies and gentlemen of the jury,

3    so they can understand, what is the difference

4    between a visual flight and an instrument flight?

5        A    The visual flight refers to, or the

6    regulation on the VF rules, it is understood that the

7    pilot has constant view of all of his surroundings.

8    He can see the horizon. He can control the plane or

9    the helicopter without having to look at the flight

10   instruments.

11       Q    And you have stated that and have explained

12   why visual flight rules flight plan was not required?

13       A    No, flight service station, you mentioned

14   before.

15       Q    Okay. So let me make the question another

16   way. Did this flight, December 30, 2002 require a

17   visual flight rule, flight plan?

18       A    Apparently you are confused and let me

19   explain. To make a flight plan means that when the

20   pilot communicates via telephone or computer,

21   internet with the agency, the flight service agency

22   in this case, which is an agency that is dedicated to

23   recording the flight route, the flight number, number

24   of passengers, the model of the equipment, the time

25   that it will take to get from point A to point B, and

1    the number of passengers on board.

2            THE COURT: And the name of the pilot.

3            THE WITNESS: And the name of the pilot. In

4    our case, the Federal Aviation Administration allows

5    us to prepare an internal flight plan for the

6    company, which was the document that was shown, where

7    we write down basically the same information and the

8    company internally keeps tracks of the helicopter

9    from the moment it takes off from Isla Grande until

10   it reaches its destination and, this is used in case

11   of an emergency.  If a person does not report within

12   a certain period of time, the plan, the company

13   understands that the helicopter or the aircraft is

14   missing, and then proceeds to prepare a search and

15   rescue plan.

16                CROSS EXAMINATION CONTINUED

17   BY MR. MARIANI:

18       Q     Okay.

19       A     And for the record--

20       Q     There is no question.

21            THE COURT: He has not finished explaining.

22            MR. MARIANI: I'm sorry.

23            THE WITNESS: And let the record reflect

24   that for Flight Service Station, the Administration

25   requires that a flight plan be prepared when an

121

1     international flight is involved, be it understood

2     that it means from San Juan, Puerto Rico to Dominican

3     Republic or any other country which is not considered

4     U.S territory.

5                    CROSS EXAMINATION CONTINUED

6     BY MR. MARIANI:

7          Q     You testified, Mr. Cruz, that this

8     helicopter is unique in Puerto Rico, the one that

9     was, that is the property of Caribbean Helicorp and

10    that relates to the photographs shown to you?

11         A     Correct.

12         Q     As a matter of fact, this model was

13    recently purchased by Caribbean Helicorp?

14         A     The helicopter was purchased in 1999.

15         Q     And that helicopter possesses a two way

16    radio, isn't that true?

17         A     Correct.

18         Q     And as a matter of fact, in Caribbean

19    Helicorp offices there is a radio so people in the

20    office can communicate if needed with any pilot?

21         A     Correct, if he is within a radius where the

22    signal can reach him.

23         Q     And as a matter of fact, those same FAA

24    regulations that you know require pilots in Puerto

25    Rico air space to have two way radios operational

1    inside an aircraft?

2         A    Correct.

3         Q    With very few exceptions?

4         A    Correct.

5         Q    And the helicopter that was shown in a

6    photograph by you, you identified as the helicopter

7    property of Caribbean Helicorp does not fall under

8    any of the exceptions that the FAA had for an

9    aircraft to fly without an operational two way radio?

10        A    Correct.

11        Q    And the information that you have, Mr.

12   Cruz, is that on December 30, 2002, the two way radio

13   and the helicopter that you have identified in the

14   photographs was operational?

15        A    To the best of my recollection, yes, it

16   was.

17        Q    And tell me if it isn't true, Mr. Cruz,

18   that within the Ponce air space there is a traffic

19   control tower at the Mercedita airport?

20        A    There is no control tower in Ponce.

21        Q    Is there some type of mechanism where

22   pilots who are going to land or who enter the air

23   space close to the Mercedita Airport can communicate

24   to and from that airport?

25        A    Yes, that is correct. The Ports Authority

123

1      at the Mercedita Airport has some persons that work

2      there that facilitate to the pilot the direction of

3      the wind --

4                  THE COURT:  The runway use.

5                  THE WITNESS: But they do not -- They cannot

6      provide any information about other air traffics,

7      what you have to do, because they are not certified

8      by the Federal Aviation as controllers.

9                        CROSS EXAMINATION CONTINUED

10     BY MR. MARIANI:

11        Q    Okay. But those employees from the Ports

12     Authority, they are there in Mercedita Airport and

13     they can contact and exchange information with the

14     pilot in flight?

15        A    If the pilot calls them, yes. It is not

16     necessary for the pilot to call.

17        Q    That I understand, but the fact is that

18     these employees from the Ports Authority are there

19     and if the need comes, the pilot can contact them?

20        A    Correct.

21        Q    Let's go, let me show you now what has been

22     marked as Government Exhibit 17. Have you been able

23     to look at Exhibit number 17?

24        A    Correct.

25        Q    And Exhibit number 17, Mr. Cruz, tell me if

124

1          it isn't true that it is what you call the log, the

2          "a vitacora" for the helicopter, N-747CH?

3                    A     Correct.

4                    Q     Tell the lady and gentlemen of the jury if

5          it isn't true that in that log there is no entry, not

6          a single entry for December 30, 2002?

7                    A     Correct.

8                    Q     Let me show you now, let me show you now

9          what has been marked as Exhibit 15 which I understand

10         is what you call the helicopter flight report and

11         before going into that document, I'm going to ask you

12         if in your 13 years of experience you have ever flown

13         in a helicopter from Isla Grande to Ponce?

14                   A     Yes.

15                   Q     Can you tell the lady and gentlemen of the

16         jury how much time does it take to fly under the

17         conditions that, the weather conditions that were

18         present on December 30, 2002, if you remember them,

19         how much time it takes to get from Isla Grande to

20         Ponce?

21                   A     Well, if it is a direct flight where it is

22         going to land at a certain specific point in Ponce,

23         in this case let's take for example the airport, we

24         are talking about 28 minutes from the moment that it

25         takes off until it lands at the airport if it goes on

125

1    a direct route.

2         Q    Okay. Does Caribbean Helicorp have other

3    aircraft, other requests, helicopters particularly?

4         A    Correct.

5         Q    Would there be a difference in speed and

6    time of flight from one helicopter to another?

7         A    Yes.

8         Q    And those 28 minutes that you have

9    testified, in what type of aircraft or, what type of

10   aircraft do you attain 28 minutes in a direct flight

11   between Isla Grande and Ponce?

12            THE COURT: Ponce landing, this is landing.

13            MR. MARIANI: Yeah, Ponce in the airport.

14            THE WITNESS: Basically, in the helicopter

15   that we use, which is AS350B2.

16                    EXAMINATION CONTINUED

17   BY MR. MARIANI:

18        Q    A direct flight from Isla Grande to the El

19   Tuque area, do you know how much time would that take

20   comparing to a direct flight from Isla Grande to the

21   Ponce airport?

22        A    I think it would be more or less the same,

23   29 minutes.

24        Q    Okay and a direct flight from Jayuya to

25   Isla Grande, do you know how much time does it take

126

1        to get a direct flight from Jayuya to Isla Grande?

2            A    It depends on what part of Jayuya it is, we

3        are talking about more or less some 20, 25 minutes.

4            Q    Okay.

5                THE INTERPRETER: Correction, 25, 30

6        minutes.

7                    EXAMINATION CONTINUED

8        BY MR. MARIANI:

9            Q    And going to the document in front of you,

10       the first question I need to you is, that document

11       titled Helicopter Flight Following Report, and you

12       have explained the purpose of that document, so I

13       gather that that document, and I ask you if it is

14       correct that that document is prepared, or at least

15       part of that document is prepared while the pilot is

16       in flight?

17           A    It should be prepared before the pilot

18       leaves. It may be prepared by the pilot or by the

19       person assigned, which in this case was Luz Anglero.

20           Q    So that document that you have in front of

21       you was prepared by Ms. Luz Anglero?

22           A    Correct.

23           Q    And you recognize her handwriting?

24           A    Correct.

25           Q    Were you present when Ms. Luz Anglero

1    prepared that document?

2        A    No.

3        Q    So you never saw Ms. Luz Anglero prepare

4    that document?

5        A    No.

6        Q    Nor do you know at what time on December

7    30, 2002 did Ms. Anglero prepare that document?

8        A    Nope.

9        Q    That document states an arrival time in

10   Jayuya, isn't that correct?

11       A    Correct.

12       Q    Can you state for the lady and gentleman,

13   gentlemen of the jury what time was that?

14       A    It says nine fifteen A.M.

15       Q    Okay. And it also states the time when the

16   helicopter arrived at isla Grande?

17       A    Correct.

18       Q    And what time was that?

19       A    10:05.

20       Q    So you would agree with me that there is a

21   50 minute interval between the pilot landing in

22   Jayuya and the pilot arriving in Isla Grande?

23       A    Correct.

24       Q    Sir, do you ever were able to communicate

25   with the pilot on December 30, 2002 between 8:30 A.M

1      and the time he arrived at Isla Grande at 10:05 A.M.?

2           A    Yes.

3           Q    So you were able to talk to him?

4           A    Correct.

5           Q    How?

6           A    I was at the Executive Orlando Airport at

7      the time. I was on my way to our airplane with a

8      customer, we were on our way back to Puerto Rico, and

9      as I was on my way to the airport, Juan Feliciano

10     called me on the phone. He explained to me what had

11     happened, the communication was very bad.  Once the

12     communication was interrupted, I called the office,

13     and that's when I learned through Luz Anglero what

14     was happening. Juan Feliciano, the pilot, called me

15     when he was in the Jayuya area.

16          Q    My question was how he called you, if he

17     called you--

18          A    Via cell phone.

19          Q    Via cell phone.

20          A    Which is provided to each pilot by the

21     company.

22          Q    So Mr. Feliciano Vega called you from the

23     company cell phone to the company cell phone that you

24     possessed in Orlando?

25          A    Correct.

1          Q    Isn't it true that when Mr. Feliciano

2     talked to you in the cell phone, he spoke to you very

3     briefly?

4          A    Correct.

5          Q    And as a matter of fact, Mr. Feliciano was

6     not able to even give you the full details of what

7     had happened on December 30, 2002?

8          A    Correct.

9          Q    And after that conversation was cut off you

10    were not able to re-establish cell phone

11    communication with Mr. Feliciano Vega?

12         A    Nope.

13         Q    Okay. Upon questions by counsel for the

14    government, you testified regarding that your

15    company, or Caribbean Helicorp accepts payment by

16    credit card?

17         A    By cash.

18              THE COURT: And check.

19              MR. MARIANI: And check?

20              THE WITNESS: Yes.

21                   EXAMINATION CONTINUED

22    BY MR. MARIANI:

23         Q    And tell me if it isn't true that this lady

24    that called you on December 28, 2002 was the first

25    time that you had heard that voice?

1           A    Yes.

2           Q    And as a matter of fact, the name of

3     Engineer Rojas didn't ring a bell because you didn't

4     knew any Engineer Rojas?

5           A    No.

6           Q    And as a matter of fact, that reservation

7     by Engineer Rojas was the first one that was made in

8     the company, that you know of under that name?

9           A    Correct.

10          Q    And isn't it true also that the lady that

11    called to make the reservations on behalf of mister -

12    - Engineer Rojas, was not willing to give you her

13    name?

14          A    Well, actually, the phone call was so brief

15    that I don't know, I mean she simply made the

16    reservation.

17          Q    And you also agreed that she wasn't even,

18    she didn't tell you Mr. Rojas', Engineer Rojas full

19    name?

20          A    No, she identified herself as Engineer

21    Rojas' secretary.

22          Q    Isn't it true that you didn't ask the

23    secretary of the engineer for the telephone number of

24    the office of this engineer?

25          A    I asked her if she could provide me with

1    some telephone number or fax number so I could send

2    the document that is usually sent and she told me

3    that she had no fax at hand and that she was out of

4    the office, and that if it was possible for Engineer

5    Rojas to pay by means of a check on the date of the

6    flight.  I told her yes, that there would be no

7    problem with that. To please call Monday morning and

8    reconfirm with secretary Luz Anglero. She agreed and

9    she said to please write down the flight and that she

10    would confirm the flight.

11        Q    Mr. Cruz, isn't it a fact that you stated

12    to this lady that you required one of two types of

13    payment; credit card or cash and that she was the

14    person who--

15        A    Credit card, cash, or check.

16        Q    So you advised the lady that she can pay in

17    any of those three ways, or your testimony is that

18    the lady, when she informed you that she didn't have

19    any credit card available, nor that she had cash,

20    asked you to accept a check?

21        A    She asked me, yes.

22        Q    Okay. So it wasn't you who offered her--

23             THE COURT: It doesn't -- Counsel, counsel,

24    counsel, let's move on, you know, the issue of

25    payment, you know.

1                    EXAMINATION CONTINUED

2    BY MR. MARIANI:

3         Q    Do you know for a fact, Mr. Cruz, if

4    payment was received, a check was received by

5    Caribbean Helicorp on December 30, 2002?

6         A    No.

7              THE COURT: No what? You don't know for a

8    fact?

9              THE WITNESS: It was not received.

10                   EXAMINATION CONTINUED

11   BY MR. MARIANI:

12        Q    And you testified that you instructed Mr.

13   Feliciano, the pilot, not leave Isla Grande without

14   receiving that check, isn't that true?

15        A    Correct.

16             THE COURT: Without receiving payment.

17                   EXAMINATION CONTINUED

18   BY MR. MARIANI:

19        Q    What did you tell Mr. Feliciano?

20        A    I had told him not to take off until he

21   received the payment in advance.

22        Q    And Mr. Feliciano did not follow the

23   instructions?

24        A    That's correct.

25             MR. MARIANI: I have no further questions

133

1      for this witness.

2                          THE COURT: Redirect.

3                          REDIRECT EXAMINATION

4      BY MS. FELDMAN:

5          Q    Mr. Cruz, as a pilot you have reviewed FAA

6      regulations, isn't that right?

7          A    Correct?

8          Q    And the FAA has lots of regulations, right?

9          A    Correct.

10         Q    But does the FAA have a regulations for

11     pilots on how they are supposed to act during a

12     hijacking?

13         A    Correct.

14         Q    Do you remember what those regulations

15     speak to?

16         A    Well, the regulation is quite long. A

17     procedure is carried out.

18         Q    And sir, how long ago did you read the

19     regulations on hijacking?

20         A    December 30, 2002.

21         Q    After the incident occurred, is that right?

22         A    Correct.

23         Q    And sir, do you know when Mr. Feliciano had

24     last read the regulations for hijacking?

25         A    I don't know.

1    Q    Now, you mentioned that you spoke with Juan

2    Feliciano, the pilot, when he called to tell you what

3    had happened, isn't that right?

4    A    Correct.

5    Q    How did he sound to you to you ?

6    A    Nervous.

7    Q    Did it sound like the Juan Feliciano that

8    you knew and that your associates knew on a regular

9    basis while working with him at Caribbean Helicorp?

10    A    No.

11    Q    Please explain.

12    A    When I received his call, the first thing

13    he told me was that he had been hijacked, that he was

14    in a mountain in the Jayuya area, that he had landed

15    because the door of the helicopter was damaged and it

16    was opening.  Then he asked me what he should do, and

17    I told him not to stay and that if he could fly to

18    fly directly to the hangar. This took ten, this

19    lasted ten, fifteen seconds maximum and then the

20    communication was cut off. Then I proceeded to call

21    the office and I told Luz Anglero what was happening

22    and I told her to call the pertinent authorities.

23    Q    And do you know if she did that?

24    A    I understand that she did, yes.

25    Q    So when Mr. Mariani, the attorney for the

1    defendant asked you if you were able to reach Juan

2    after that phone call and you said no, do you know

3    why it is you weren't able to reach him?

4         A    Two reasons, because we were on or way to

5    the airplane with the customer to go to San Juan, and

6    number two, I was not able to establish communication

7    with him via cell phone.

8         Q    Why not?

9         A    I don't know.  I tried on several occasions

10   but I was not able to establish communication.

11        Q    Now sir, I am going to show you Exhibit 16.

12   Now, Mr. Mariani asked you about the white out on the

13   calendar of December 30th, do you remember him doing

14   so?

15        A    Correct.

16        Q    Can you look at the calendar for the

17   December month, and can you tell the jury how many

18   spaces there are with white out on the calendar,

19   approximately?

20        A    More than 15.

21        Q    Why is there so much White Out on the

22   calendar?

23        A    Well, because this calendar is not an

24   official calendar. We use it only to, we are guided

25   by it for purposes of our agenda during that month.

1     It means that if a customer called and said that he

2     wanted to reserve for such and such a date, and two

3     days later he calls to cancel, well, then we white it

4     out simply to make room for other flights that will

5     come up.

6     Q    And sir, you said that 15 out of the days

7     of the month of December, 15 days sir, changes were

8     made with white out on the calendar?

9     A    Correct.

10    Q    Sir, is that typical in that you received

11    cancellations for reservations in the average month?

12    A    Correct.

13    Q    Now sir, I am going to ask you about the

14    confirmation agreement. Now, counsel asked you why

15    that had not been completed, the confirmation

16    agreement. On every reservation is that confirmation

17    always sent out to the customer?

18    MR. MARIANI: Your Honor, I object. That is

19    irrelevant to this case.

20    THE COURT: Denied, denied.

21    THE WITNESS: Before the date on which the

22    events occurred, it was a company policy to send the

23    confirmation, but it wasn't a requirement given the

24    fact, given the great number of flights that we had

25    with engineers. Specifically for that specific

1     project for that day, we do this, we have done this

2     on a number of occasions with the Highway Authority,

3     the Puerto Rico government, with private construction

4     companies.

5                    CROSS EXAMINATION CONTINUED

6     BY MS. FELDMAN:

7          Q     Now if you were send out that confirmation

8     agreement, what information would you need?

9          A     Basically the information that the person

10    provided me with, the name of the client or the

11    customer, the date of the flight, and the route of

12    the flight, and the amount of money that was

13    established between the company and the customer.

14              That is sent via fax, and the person

15    confirms by, well, it could be a credit card to

16    reserve the flight. There is a note on that

17    confirmation that if for any reason the flight is

18    canceled, the company will keep a certain portion of

19    that money since the company reserved that flight,

20    that space for that customer. It is basically like a

21    small contract between the company and the client and

22    to that date the company established --

23              MR. MARIANI: Your Honor, it was asked and

24    answered already.

25              THE COURT: Sustained.

1                    EXAMINATION CONTINUED

2    BY MS. FELDMAN:

3        Q    Now sir, technically that is what is

4    supposed to happen, right?

5        A    Correct.

6        Q    Despite the company rule, does it happen

7    that way every time?

8        A    Nope.

9        Q    Why not?

10       A    Well, we have some clients that fly with us

11   two, three, four times a month. We have known them

12   for a long time. They have been flying with us for a

13   long time, therefore, when one of these persons

14   calls, we simply write it down on the calendar and it

15   is confirmed on the phone. Basically the confirmation

16   agreement is prepared when a new person is involved,

17   someone we don't know.

18       Q    Now, in this case, when you received the

19   telephone call from the lady on Saturday the 28th,

20   were you able to send her a confirmation agreement?

21       A    No.

22       Q    Why not?

23       A    She told me that she did not have a fax

24   handy, she was out of the office.

25       Q    What about her full name, did you get her

1    full name?

2         A    No, she introduced herself as the secretary

3    of Engineer Rojas who was the person who was going to

4    fly.

5         Q    So basically, you were going on what she

6    had told you, isn't that right?

7         A    Correct, because that is the typical type

8    of phone call from our clients in the construction

9    field in Puerto Rico.

10        Q    And the time, did it sound out of the

11   ordinary?

12        A    No.

13        Q    Now, sir, with regard to the log which has

14   a number on it 17, do you know if that appears

15   typical of the log you would see as a pilot in a

16   plane?

17        A    Correct.

18        Q    And sir, have you as a pilot who flies

19   helicopters completed that form?

20        A    Yes.

21        Q    Now sir, is it your practice to complete

22   the form before, during, and after, or on different

23   occasions, in different manners?

24             MR. MARIANI: I have an objection, Your

25   Honor. The question is for what is practice, he was

1    not a pilot in --

2              THE COURT: Denied.

3                        CROSS EXAMINATION CONTINUED

4    BY MS. FELDMAN:

5        Q    Do you understand my question, sir?

6        A    Yes, it all depends basically on the pilot

7    involved. Many persons fill it out before the flight,

8    others at the end of the flight. Well, because what

9    counts, actually, for purposes of the Federal

10   Aviation Administration is the time or, look, every

11   helicopter has what is known as a hub meter, and if

12   you can observe, what says here "forward", that is

13   the time that the helicopter has at that moment--

14             THE COURT: Irrespective of whether I sign

15   in when I left and arrived.

16             THE WITNESS: When the helicopter lands, we

17   refer to the number of the hub meters, which is

18   written on the total for the day, and subtracted from

19   the forward, we view the total number of flight hours

20   for the day and that is what counts for purposes of

21   maintenance in terms of the Federal Aviation

22   Administration.

23                        EXAMINATION CONTINUED

24   BY MS. FELDMAN:

25       Q    So, looking at that form, sir, the pilot,

1    Juan Feliciano, was in compliance by completing those

2    numbers, isn't that right?

3              MR. MARIANI: I have an objection, Your

4    Honor. She is asking for an opinion.

5              THE COURT: No, denied.

6                   EXAMINATION CONTINUED

7    BY MS. FELDMAN:

8         Q    Well, I will withdraw. I will withdraw the

9    question. Now, who actually takes the money for the

10   reservations made for helicopter flights, if you

11   know?

12        A    It could be the pilot, it could the

13   secretary, it could be me.

14        Q    You as the managing individual at the

15   company?

16        A    Correct.

17        Q    Now, on mornings when you come in to fly

18   your helicopter, there have been occasions that the

19   flights have been paid for prior to you receiving the

20   passengers, isn't that right?

21        A    Correct.

22        Q    And often -- what time do you usually

23   arrive to work?

24        A    Nine, ten A.M.

25        Q    Okay. Who is there before you get there?

142

1        A    Luz Anglero.

2        Q    Now, if Luz Anglero was there before you

3    got to work, would she be the person who accepted the

4    payment if payment has been made?

5             MR. MARIANI: This is leading, Your Honor.

6             THE COURT: Sustained.

7                     EXAMINATION CONTINUED

8    BY MS. FELDMAN:

9        Q    Who would have to accept the payment if,

10   for instance, you were not at the company?

11       A    It could be the pilot or it could be Luz

12   Anglero. For example, Luz Anglero comes into work at

13   eight A.M., if the flight is at six A.M., and Luz

14   Anglero is not at the office at the time, the pilot

15   can receive the payment.

16       Q    Now, Juan Feliciano, do you know at what

17   time he arrived at work on the 30th of December 2002?

18       A    No.

19       Q    Do you know what -- I'm sorry.  I believe

20   you said that Luz usually arrives at eight o'clock,

21   is that correct?

22       A    Correct.

23       Q    Now, on December 30, 2002, in the morning,

24   you weren't at Caribbean Helicorp, is that right?

25       A    Correct.

1          Q    But Luz would have been there if she was

2     working her normal hours, is that right?

3          A    Yes, that is my understanding, yes.

4               MS. FELDMAN:  I have no further questions,

5     Your Honor.

6               THE COURT: Any other questions?

7                    RE-CROSS EXAMINATION

8     BY MR. MARIANI:

9          Q    Mr. Cruz, do you know by a fact that Ms.

10    Luz Anglero was there at 8:30 A.M. on December 30,

11    2002?

12         A    I don't know if she was there at 8:30. When

13    I called the company she was there.

14         Q    And at what time was it that you called the

15    company, more or less?

16         A    Well, I don't recall the exact time. It is

17    possible that it may have been after 8:30 because

18    Juan Feliciano, the pilot, called me.

19         Q    Okay. And do you remember more or less at

20    what time did Mr. Juan Feliciano call you?

21         A    Not exactly.

22         Q    But the call was made after he had landed

23    in Jayuya on December 30, 2002?

24         A    Correct.

25         Q    One of the first questions made by counsel

1    for the government, Ms. Feldman, was regarding the

2    FAA regulations and regarding FAA regulations for

3    hijacking and you stated, tell me if you agree with

4    me, that there are specific regulations by the FAA

5    for hijacking?

6         A    Correct.

7         Q    And, as a matter of fact, you testified

8    that you have been able to review those regulations?

9         A    Correct.

10         Q    And tell me if it isn't true that those

11    regulations require a pilot as soon as it is possible

12    to establish two way radio communication?

13         A    With whom?

14         Q    That is my question, if the pilot has to

15    establish two way radio communication?

16         A    At what time?

17         Q    Let me, let me rephrase the question. Tell

18    me if it isn't true that the FAA regulations for

19    emergency conditions caused by air piracy or hostile

20    acts by a person during flight requires, if

21    circumstances permit, the applying of radio

22    telephoning procedures if circumstances permit?

23         A    If circumstances permit it, yes.

24         Q    And the fact is that as soon as those

25    circumstances exist that permit that two way

1    communication, for example, with a radio control

2    tower to be made, the regulations require that that

3    communication be made?

4         A    Correct.

5         MR. MARIANI: Thank you, I don't have any

6    other questions for this witness.

7              THE COURT: You may step down.

8              (The witness was excused)

9              THE COURT:  Okay, ladies and gentlemen, we

10   are going to recess until tomorrow at 9:30. There

11   were some people from the press here, remember my

12   instructions not to read anything in the newspaper

13   concerning this case, nor watch any T.V. program or

14   hear any radio broadcast. If you happen to do read

15   something, please don't tell the other fellow jurors

16   and we will deal with that tomorrow. Have a safe trip

17   home, we'll see you back tomorrow at 9:30, you are

18   excused.

19              (Court recessed)

20

21

22

23

24

25

146

1

2

3

4

5

6                        REPORTER'S CERTIFICATE

7

8

9            I, BOABDIL VAZQUETELLES, JR. Official Court

10          Reporter in the United States District Court for

11          the  District of Puerto Rico, appointed pursuant

12     to the provisions of Title 28, United States Code,

13     Section 753, do hereby certify that the foregoing is

14     a true and correct transcript of the proceedings had

15     in the within entitled and numbered cause on the date

16     hereinbefore set forth and I further certify that the

17     foregoing transcript has been prepared under my

18     direction.

19

20

21

22          _____

23          Boabdil Vazquetelles, Jr.

24

25